[No. B073686. Second Dist., Div. Four. July 29, 1996.]

DIOMEDES COLOME et al., Plaintiffs and Respondents, v.
STATE ATHLETIC COMMISSION OF CALIFORNIA et al., Defendants
and Appellants.

## COUNSEL

Daniel E. Lungren, Attorney General, Willard A. Shank, Assistant Attorney General, Donald R. Currier and Michael B. Hughes, Deputy Attorneys General, Patterson, Ritner, Lockwood, Zanghi & Gartner, Robert R. Scholl, Greines, Martin, Stein & Richland, Martin Stein, Roxanne Huddleston and Alison M. Turner for Defendants and Appellants.

Johnnie L. Cochran, Jr., Brian T. Dunn, Greenblatt & Associates and Frederic J. Greenblatt for Plaintiffs and Respondents.

## OPINION

ARANDA, J.*—

### PROCEDURAL HISTORY

Kimberly Kelly, M.D., and Armando Morales, Ph.D., appellants/defendants appeal from a judgment for respondents/plaintiffs Diomedes Colome, a licensed boxer, and his manager, Jimmy Montoya.

---

*Judge of the Municipal Court for the South Bay Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

The State Athletic Commission of California (hereinafter the Commission), Kenneth Gray, then the executive director of the Commission; Frederick Flynn, O.D., head of the Commission's medical advisory committee; and Richard Drew, Ph.D., who worked with Flynn on the formulation of the Commission's neurological test and standards are also defendants/appellants. All these parties are hereinafter referred to as the "State defendants." They appeal from a judgment in favor of Colome.

## STATEMENT OF FACTS

Respondent Diomedes Colome was born in the Dominican Republic. He dropped out of school after the second grade. Consequently, he is essentially illiterate. Colome quickly realized that the one thing he could do better than any person he knew was box, and from his early childhood he pursued his aspiration to become a champion professional boxer.

At the age of 11, Colome began devoting his energy exclusively to the sport of boxing. At the age of 13, he won the Dominican Republic national championship for the first time. He went on to win the national championship 12 times. He made his first trip to the United States as a 15-year-old winning the gold medal world championship for his age group. Thereafter he won the "golden gloves" tournament for three consecutive years in New York City. Colome does not speak English.

When he turned 17 Colome began training under the tutelage of respondent Jimmy Montoya. Montoya engaged Colome in a vigorous amateur boxing schedule through which he compiled a record of 112 wins and 3 defeats. As a professional boxer Colome's success continued, and by age 23 he amassed a record of 24 wins and 1 loss. He won the ESPN welterweight championship and was invited to participate in the Stroh Boxing Tournament scheduled for the Inglewood Forum on February 8, 1988.

Jimmy Montoya became a boxing manager in California in 1974. Since that time he has operated the "Gym of Champions, Montoya-Azteca Gym." He successfully managed a number of well-known prize fighters including several title holders. He would support his boxers financially, providing living and food allowances and instituted a program of physical conditioning and training. In 1987 he had approximately 80 to 100 boxers. In 1989, after the Colome incident, he had 30 boxers.

On September 17, 1987, Colome successfully passed both the mental status examination and a general neurological examination required by the

Commission under Business and Professions Code section 18711[1] as a condition of licensure. When his license came up for renewal at the end of December 1987, his license should have been automatically renewed without the requirement of submitting to another neurological examination pursuant to Business and Professions Code section 18711, subdivision (b) which provides: "In the event that an applicant for licensure as a professional boxer undergoes a neurological examination for purposes of licensure within the 120-day period immediately preceding the normal expiration of that license the applicant shall not be required to undergo an additional neurological examination within the following calendar year unless the commission, for cause, orders that the examination be taken. The commission shall notify all commission approved physicians and referees that the commission has the authority to order any professional boxer to undergo a neurological examination."

However, the Commission notified Montoya that Colome was required to submit to another neurological examination if he wanted to have his license renewed. Montoya questioned the need for the exam since he was unaware of any cause for ordering another examination so quickly. His objections were to no avail, and Colome was required to appear for the examination.

In 1987 defendant/appellant Kimberly Kelly, a practicing physician and neurologist at the University of California at Los Angeles (UCLA) submitted a bid to the Commission to perform boxers' neurological examinations. She believed she would be particularly well equipped to perform the exams because many of the boxers were non-English speaking and she had access to the interpreter service at UCLA. Her bid was accepted with the contract provision that: "All examinations shall be personally performed by the physician who is certified in neurology . . . . The mental status portion of the exam may be performed by a licensed neuropsychologist."

Colome's first examination was scheduled for January 22, 1988, but was rescheduled for February 2, 1988, just six days before his Stroh tournament

---

[1] Business and Professions Code section 18711, subdivision (a) reads: "The commission shall require, as a condition of licensure and as part of the application process, the examination by a licensed physician and surgeon who specializes in neurology and neurosurgery of each applicant for a license as a professional boxer or, if for the renewal of a license, this examination every year if the boxer has boxed within the preceding year, in addition to any other medical examinations. The physician may recommend any additional tests he or she deems necessary. On the basis of that examination and any additional tests that are conducted, the physician may recommend to the commission whether the applicant may be permitted to be licensed in California or not. The executive officer shall review these recommendations and report any denials of licensure. If, as a result of these recommendations, the executive officer refuses to grant the applicant a license, the applicant shall not box in California until the denial has been overruled by the commission as provided in this chapter."

semifinal bout. Colome and Montoya arrived at UCLA for the examination and were met by defendant/appellant Armando Morales.

Sometime after Kelly and the Commission signed their contract, she met Morales, the director of clinical social work and a professor of psychiatry at UCLA. Morales was not a neuropsychologist, psychologist or neurologist. He held a doctorate degree (Ph.D.) in social work. She testified that she believed Morales would be an ideal person to work with the Spanish-speaking boxers because he was a professional, bilingual, understood the cultures from which many of the boxers came and was a former amateur boxer himself. Morales had performed thousands of similar exams and Kelly believed him to be fully qualified to administer this examination.

Kelly sent Morales's resume to the Commission and discussed it with Flynn. It had been Flynn's responsibility as head of the Commission's medical advisory committee to develop the neurological exam. He had been aided in this endeavor by Richard Drew, Ph.D. Morales was trained in the administration of the mental status portion of the neurological examination by both Flynn and Kelly. Both Flynn and Kelly testified that it is an acknowledged and common practice in California for physicians to utilize paraprofessionals in the administration of the mental status portion of the neurological exam.

Morales administered the tests to Colome in Spanish without the aid of an interpreter. The examination consisted of various psychometric tests such as the "Trails A" test which was a "connect the dot" numbers test, the "Trails B" test which alternated numbers and letters, the "symbol digit modalities" test where the examinee paired a symbol to a letter by referring to a legend equating the two, and the verbal memory test where the examinee chose four words—a city, an animal, a number and a color—and was asked to repeat them later during the test. Colome's lack of literacy was evidenced by his inability to even recite the alphabet.

After administering the tests Morales did not interpret them, but simply left the results without comment for Kelly to review when she did the physical examination. Kelly scored the examination without the knowledge that Colome was illiterate and unable to even recite the alphabet. She determined that Colome had failed and notified the Commission. Martin Denkin, a Commission officer, advised the Stroh tournament officials and asked them to notify Colome and Montoya.

On the morning of the bout, February 8, 1988, Colome reported to the forum for the weigh-in. Gray and Denkin discussed the examination results

with Montoya and tournament officials and the Commission's decision was that Colome would not be permitted to fight. Montoya's pleas to Gray and Flynn were to no avail. When Montoya informed Colome of the Commission action, Colome reacted to the news by slamming his bare fist into the hotel bathroom door with great force causing injury to his hand. The injury cut short his career.

The oral notification to Montoya was followed by a letter to Colome from the Commission which officially stated that the results of Colome's examination showed early signs of neurological impairment. Colome sought a second opinion from psychologist Carlos Saucedo.

Dr. Saucedo performed a comprehensive mental status examination consisting of many of the same psychometric tests administered by Morales, as well as additional intelligence tests which were not part of the Commission's exam. In cross-examination he testified that Colome scored "below average" on concentration and cognitive tracking on the Trails A test and on the memory, visual-spatial tasks, psychomotor and symbol digit modalities tests as well.

In scoring the exam Saucedo relied on studies which demonstrated that Spanish-speaking boxers generally scored lower on such tests than English speaking boxers. Although Colome amply demonstrated substantial neurological deficits, Saucedo rated Colome as "normal." This report was forwarded to the Commission. Both Flynn and Drew reviewed the results of the examination and recommended that Colome be relicensed. Gray then sent a letter on behalf of the Commission granting Colome his boxing license as of May 12, 1988.

Montoya testified at the trial that in anticipation of Colome winning the Stroh tournament, he had spoken to a number of promoters and had lined up lucrative deals with Dan Duva of Main Events Productions, Duke Durden of Don King Productions and Steve Eisner of Eisner Productions in Arizona, as well as setting Colome up as the sparring partner for Sugar Ray Leonard. Montoya testified as to the financial losses to Colome as well as to himself.[2]

Montoya further testified that his previous good reputation in the boxing world was devastated by these events, that he suddenly became a pariah and no longer had the "juice" with the top guns in boxing. "Juice," as described by Montoya, is what a manager has who has successful fighters who are

---

[2]Montoya testified his agreement with Colome called for him to receive one-third of all payments received by Colome.

being called upon by promoters to fill boxing cards. He testified that this "juice" in turn attracted new fighters. Montoya claimed that his income had declined significantly because of the perception that he no longer had "juice."

Montoya filed a complaint containing causes of action for breach of statutory duty and for interference with prospective economic advantage. Montoya's action was dismissed as to the state defendants only and proceeded against Kelly and Morales. At trial Montoya prevailed against Kelly and Morales on these causes of action and was awarded damages in the sum of $200,000.

After a seven-week trial Colome also prevailed. As to his claims against the State defendants, the jury found no civil rights violations or negligent supervision but that: (1) all defendants were liable for breach of the mandatory statutory duties under Business and Professions Code section 18711, subdivisions (a) and (b) and that Kelly was 45 percent liable and Morales was 5 percent liable; (2) that for the negligent hiring of Morales that Kelly was 75 percent at fault and Flynn 25 percent; and (3) liability for negligent supervision. Finally, the jury found that Colome injured his hand when he learned he would not be permitted to fight and that it was foreseeable that he would do so. The jury also found Morales was an employee of UCLA and not an employee of the state.

The jury awarded Colome $85,000 in economic damages connected with the Stroh tournament, $500,000 in economic damages to his overall career (reduced by Colome's 9 percent comparative fault for striking the door), $225,000 in noneconomic damage connected with the Stroh tournament and § 425,000 in noneconomic damage connected with Colome's overall career.

On November 9, 1992, the judgments were entered. The trial court denied the motions for a new trial and for judgment notwithstanding the verdict. Kelly and Morales filed their timely appeal on January 20, 1993. The State defendants filed timely notice of appeal on February 1, 1993.

## Issues

This matter primarily concerns the relationship of Business and Professions Code section 18711 to the Tort Claims Act in Government Code sections 815.6, 818.4, 821.2 and 855.6.

1. Does Business and Professions Code section 18711 impose a mandatory duty?

2. Does the Commission have the protection of sovereign immunity?

3. Do the Commission employees enjoy immunity?

4. Does the physician employed by the Commission enjoy immunity?

DISCUSSION

I

*Does Business and Professions Code Section 18711 Create a Mandatory Duty Upon the Commission Which Creates Liability?*

We note that this is a case of first impression as to Business and Professions Code section 18711. It is clear that any duty is statutory. Does the section create a new mandatory duty? ▮ A court's primary task in construing a statute is to determine and effectuate the Legislature's intent in order to carry out the purpose of the law. (*Parris* v. *Zolin* (1996) 12 Cal.4th 839, 845 [50 Cal.Rptr.2d 109, 911 P.2d 9].) The statutory language is the best indicator. (*Williams* v. *Superior Court* (1993) 5 Cal.4th 337, 350 [19 Cal.Rptr.2d 882, 852 P.2d 377]; *Hall* v. *Regents of University of California* (1996) 43 Cal.App.4th 1580, 1586 [51 Cal.Rptr.2d 387].)

We need to turn to a review of the legislative history. The legislation which created Business and Professions Code Section 18711 was Assembly Bill No. 240, authored by Assemblyman Art Agnos in 1985. The author specified his intent as follows: "This legislation gives the Athletic Commission the ability to identify fighters who have signs of brain damage and stop them from worsening their conditions." The section was modeled after similar legislation in New York. At that time, neurological examinations were also required in Nevada. The passage of the legislation was supported by the Commission. The bill passed with wide support, 68-3 in the Assembly and 39-0 in the Senate. The measure was signed by the Governor and became effective July 1, 1986.

The bill resulted from a study published in The Journal of the American Medical Association, volume 251, No. 20, May 25, 1984, at page 2663 and which was submitted into the record at the legislative hearings. In the study 18 former and active boxers underwent neurological examination, electroencephalograms, computed tomagraphic scan of the brain and neuropsychological testing. Eighty-seven percent of the professional boxers had definite evidence of brain damage. All the boxers had abnormal results on at least one of the neuropsychological tests. The study concluded that brain damage is a frequent result of a career in professional boxing.

The Journal of the American Medical Association study clearly posited the risks of head injury to professional boxers. Based upon this study and the literature submitted at the legislative hearings on the measure as well as the testimony introduced, it is clear that the author and those who supported the measure did so with the intent of providing additional protection from injury for the professional fighter who might already have sustained some significant head trauma. It was the intent of the Legislature to require the Commission to set in motion measures that would protect already injured fighters from the risk of additional injury or death in the ring. The measure does not require all residents of California to submit to neurological examinations or even all boxers. It is applicable only to boxers who seek to be licensed in California.

 In essence, Business and Professions Code section 18711 requires that as a condition of licensure in California, a boxer who wants to fight within this state must undergo an "examination by a licensed physician and surgeon who specializes in neurology and neurosurgery . . . every year . . . ." If he does so, then it is the duty of the physician to report his or her findings to the Commission and indicate whether the applicant should be permitted to box. Thereafter, it is the duty of the Commission, acting through its executive director, upon a review of the medical findings to either grant or reject licensure. The applicant cannot box until a denial has been overruled by the Commission.

Respondent Montoya argues the Commission's duty is mandatory and that as such any Commission claim of immunity cannot attach. He cites those cases, which the trial court accepted, which set forth the precedent that a breach by the state of a mandatory duty precludes immunity, i.e., *Elson* v. *Public Utilities Commission* (1975) 51 Cal.App.3d 577 [124 Cal.Rptr. 305] and *Young* v. *City of Inglewood* (1979) 92 Cal.App.3d 437 [154 Cal.Rptr. 724]. These cases are clearly inapplicable because while the requirement that a prize fighter needs to undergo a neurological exam "by a licensed physician and surgeon who specializes in neurology and neurosurgery" is one which is mandatory upon the boxer who wishes to fight in California, the decision as to whether to issue the license is discretionary with the Commission.

II

*Does the Commission Have the Protection of Sovereign Immunity?*

 The Tort Claims Act specifies that a public entity is not liable for tortious injury unless the liability is imposed by statute. Sovereign immunity

is the rule in California. Governmental liability is limited to exceptions specifically set forth by statute. (*Zuniga* v. *Housing Authority* (1995) 41 Cal.App.4th 82, 92 [48 Cal.Rptr.2d 353]; *Washington* v. *County of Contra Costa* (1995) 38 Cal.App.4th 890, 895-896 [45 Cal.Rptr.2d 646]; *Cochran* v. *Herzog Engraving Co.* (1984) 155 Cal.App.3d 405, 409 [205 Cal.Rptr. 1].)

The Supreme Court has enunciated the purpose of the Commission concerning those who participate in boxing matches. "[I]t is manifest that one of the chief goals is to provide safeguards for the protection of persons engaging in the activity." (*Hudson* v. *Craft* (1949) 33 Cal.2d 654, 659 [204 P.2d 1, 7 A.L.R.2d 696].)

▮▮▮ Respondents argue in support of their judgment and the trial court that the duty imposed by the Business and Professions Code section 18711 is mandatory and consequently creates liability pursuant to Government Code section 815.6 which states: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

The decision to issue a license is a discretionary act. Public entities, such as the Commission, are immune from liability for injury caused by the refusal to issue a license or permit when the entity is authorized by law to determine whether or not the license should be issued. (*Burchett* v. *City of Newport Beach* (1995) 33 Cal.App.4th 1472, 1480 [40 Cal.Rptr.2d 1]; *MacDonald* v. *State of California* (1991) 230 Cal.App.3d 319, 330 [281 Cal.Rptr. 317]; *West* v. *State of California* (1986) 181 Cal.App.3d 753, 761 [227 Cal.Rptr. 16].)

The Tort Claims Act pursuant to Government Code section 818.4 is clear. "A public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order, or similar authorization where the public entity or an employee of the public entity is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked."

We further find the injury complained of herein, the loss of prize money in the Stroh tournament by Colome and his conceivable future earnings as a prize fighter, is not merely highly speculative, but specifically was not the type of injury the statute was designed to prevent as foreseeable and thus

provide a basis for civil liability. (*Zolin* v. *Superior Court* (1993) 19 Cal.App.4th 1157, 1161 [23 Cal.Rptr.2d 871]; *Keech* v. *Berkeley Unified School Dist.* (1984) 162 Cal.App.3d. 464, 470 [210 Cal.Rptr. 7].)

The legislative intent clearly indicates that Business and Professions Code section 18711 was solely intended to protect the boxer from further head trauma, debilitating injury or death. Hence, there can be no liability imposed upon the Commission. (*State of California* v. *Superior Court (Perry)* (1984) 150 Cal.App.3d 848, 854 [197 Cal.Rptr. 914]; *Novoa* v. *County of Ventura* (1982) 133 Cal.App.3d 137, 144 [183 Cal.Rptr. 736]; *State of California* ex rel. *Dept. of Rehabilitation* v. *Superior Court* (1982) 137 Cal.App.3d 282, 286 [187 Cal.Rptr. 1]; *Whitcombe* v. *County of Yolo* (1977) 73 Cal.App.3d 698, 708 [141 Cal.Rptr. 189].)

We hold that sovereign immunity applies. The judgment as to the Commission is reversed and the trial court is directed to enter judgment for appellants and cross appellants.

## III

### *Do the Commission Employees Enjoy Immunity?*

The starting point is the statute. The applicable provision of the Tort Claims Act states: "A public employee is not liable for an injury caused by his issuance, denial, suspension or revocation of, or by his failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order, or similar authorization where he is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked." (Gov. Code, § 821.2.)

It is state policy to protect its public officials from decisions made in the course and scope of their employment. The immunity for state employees in licensure cases is absolute. (*Thompson* v. *City of Lake Elsinore* (1993) 18 Cal.App.4th 49, 57 [22 Cal.Rptr.2d 344]; *Rosenthal* v. *Vogt* (1991) 229 Cal.App.3d 69, 75 [280 Cal.Rptr. 1].)

The Supreme Court has recently reinforced a strict construction of public official immunity. "Because of the special needs of government and public service, the Tort Claims Act expressly allows public employees to engage in certain acts and omissions free of suit, even when they might otherwise be liable for causing injury or violating individual rights. Among the statutory protections afforded is the immunity for discretionary acts, which leaves public officials free of unseemly judicial interference against them personally when they debate and render those basic policy and personnel decisions

entrusted to their independent judgment." (*Caldwell* v. *Montoya* (1995) 10 Cal.4th 972, 988 [42 Cal.Rptr.2d 842, 897 P.2d 1320].)

Colome does not point out any provision of Business and Professions Code Business and Professions Code section 18711 which required Gray to issue him a license. In his brief Colome has only been able to point out procedural steps "unnecessarily" taken, such as the requirement to take an additional examination even though he had previously passed one within the prior 120 days. Discretion as to whether a boxer must take any examination is vested in the executive officer of the Commission.

Colome's remedy for Gray's action in requiring another exam within the 120-day period or in failing to license him is provided within Business and Professions Code section section 18711 itself: "[T]he applicant shall not box in California until the denial has been overruled by the commission as provided in this chapter." Colome was required to exhaust his administrative remedies and to seek administrative mandamus through the courts, which he chose not to do. Instead he sought a second opinion from Dr. Saucedo and reconsideration. (See Bus. & Prof. Code, §§ 18841 and 18842; *Rudolph* v. *Athletic Commission* (1960) 177 Cal.App.2d 1, 4 [1 Cal.Rptr. 898].)

The actions of the Legislature in the enactment of section 18711 anticipated the preparation of examination standards for the use of physicians in the administration of the neurological testing. The fact that the Commission turned to Flynn as one of its own employees in his capacity as the head of its medical advisory committee is understandable. The trial court appears to have attached liability to Flynn for having assisted Kelly in training Morales. Since Flynn had just developed the testing matrix, it is understandable that he should have done so.

Flynn's utilization of Drew as a psychiatrist to develop these standards was sound. Other than having been a prevailing defendant in the civil rights claims for having contributed to the formulation of the Commission's examination, Drew had no other involvement in the matter involving the February 1988 examination. His participation in reviewing Dr. Saucedo's report which resulted in Colome being relicenced only inured to the benefit of Colome.

We find no basis upon which liability can be premised upon the actions of Gray, his staff, Flynn or Drew. The judgments are reversed and the trial court is directed to enter judgments for these defendants/cross-appellants.

## IV

*Does the Physician Employed by the Commission Enjoy Immunity?*

Colome was not a private patient. The only reason that he was examined by Dr. Kelly was in her capacity as an examiner for the Commission. After the examination Kelly reported her evaluation and diagnosis not to Colome, but to Gray at the Commission. She rendered no treatment to Colome nor suggested any medical procedure to him.

Colome did not tender payment to Kelly. The compensation received by Kelly was only pursuant to the contract which she had with the Commission. Her client was the Commission, not Colome. Kelly owed no mandatory duty to Colome as Montoya argues in his brief. Her duty was contractual to the Commission. The jury finding that Kelly was an employee of the Commission is correct.

The relevant Tort Claims Act statute is Government Code section 855.6: "Except for an examination or diagnosis for the purpose of treatment, neither a public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make . . . an adequate physical or mental examination, of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health and safety of himself or others."

We note the Law Revision Commission Comment in regard to the statute. "This section declares an immunity that has been recognized by the New York courts in the absence of statute. It grants an immunity for failure to perform adequately public health examinations, such as tuberculosis examinations, *physical examinations to determine the qualifications of boxers and other athletes* . . . . [¶] The immunity provided by this section relates only to failure to make any examination or, if an examination is made, *to the 'adequacy' of the examination;* the section does not provide immunity, for example, where a public employee negligently injures a person while making an examination." (4 Cal. Law Revision Com. Rep. (Jan. 1963) p. 865, italics added.)

It is impossible to conceive of a more explicit indication of statutory intent that would apply than this one does to the case herein. It is undisputed that the purpose of the examination was to determine the fitness of Colome to be licensed. This was not an examination or diagnosis that was made for the purpose of treatment. Immunity applies. In a somewhat analogous case, the

Supreme Court applied immunity to physicians at a state mental hospital who declared a patient sane but upon his release assaulted and caused the death of a child. "[I]t is clear that the medical men, in expressing a good-faith opinion as to a patient's mental condition, are protected by the specific language of Government Code section 855.6 . . . ." (*Kravitz* v. *State of California* (1970) 8 Cal.App.3d 301, 306 [87 Cal.Rptr. 352].)

Morales was an agent of Kelly. He merely recorded the results and interpreted the test texts from English to Spanish. He made no diagnosis or recommendation. He is protected by the same brush of immunity as applied to Kelly.

Setting aside the immunity that compels reversal of both Colome's and Montoya's judgments, the judgment in favor of Montoya on the alternative theory of interference with prospective economic advantage also fails. A defendant can be held liable for economic harm inflicted upon a third party with whom he has no direct dealings only when the policy criteria that determine whether a duty should be found are met. (*Seeley* v. *Seymour* (1987) 190 Cal.App.3d 844, 860 [237 Cal.Rptr. 282]; *J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 803-804 [157 Cal.Rptr. 407, 598 P.2d 60]; *Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358].)

The policy factors are: " '(1) the extent to which the transaction was intended to affect the plaintiff; (2) the forseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury suffered; (5) the moral blame attached to the defendant's conduct; and (6) the policy of preventing future harm.' [Citations.]" (*Seeley* v. *Seymour, supra,* 190 Cal.App.3d at p. 861.)

The neurological examination herein was not intended to affect Montoya. The purpose of the exam is to protect the health and safety of boxers by detecting early signs of neurological impairment. It was a fitness examination on Colome. Kelly made a recommendation to the Commission. The ultimate decision on whether to grant Colome a license rested with the Commission. Conceivably, Gray could have totally ignored the findings made by Kelly. There is little forseeability of harm to Montoya since he was not the issue. The degree of certainty that Montoya suffered any injury is in grave doubt since all the damages asserted herein are highly speculative.

Any connection between Kelly's conduct and any injury suffered by Montoya were filtered through the actions of the Commission. We can

ascribe no moral blame upon Kelly in determining that Colome might be at risk. And, finally the policy of preventing future harm is not an issue under our circumstances. We have previously found that Kelly and Morales did not owe Colome a duty. Now, applying those factors noted above compels the conclusion that Kelly and Morales did not owe Montoya a duty.

The judgments as to Kelly and Morales are reversed and the trial court is directed to enter judgment for appellants.

## CONCLUSION

We find no breach of the Tort Claims Act pursuant to Government Code section 815.6 and apply the licensing testing immunity of Government Code sections 818.4, 821.2 and 855.6 to appellants Kimberly Kelly, M.D., and Armando Morales, Ph.D., as well as to all State defendants. The judgments are reversed and the trial court is directed to enter judgment for the appellants.

Each party is to bear its own costs on appeal.

Vogel (C. S.), P. J., and Baron, J., concurred.

Respondents' petition for review by the Supreme Court was denied October 16, 1996. Mosk, J., was of the opinion that the petition should be granted.