[No. S063167. July 13, 1998.]

SIERRA CREASON, a Minor, etc., et al., Plaintiffs and Appellants, v. DEPARTMENT OF HEALTH SERVICES, Defendant and Respondent.

624

**COUNSEL**

Berglund & Johnson and Harrison W. Sommer for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Margaret A. Rodda, Assistant Attorney General, Robert H. Francis, Richard J. Rojo, Donald R. Currier and Joel A. Davis, Deputy Attorneys General, for Defendant and Respondent.

**OPINION**

CHIN, J.—Plaintiff Sierra Creason, a minor, and her parents, plaintiffs Claudia and Matthew Creason, sued defendant State of California (acting through the State Department of Health Services (Department)), seeking damages allegedly arising from the state's failure to diagnose and report timely and accurately that Sierra was suffering from congenital hypothyroidism. The trial court sustained defendant's demurrer to the first amended complaint without leave to amend and dismissed the action. The Court of Appeal reversed, concluding that plaintiffs adequately stated a cause of action against defendant for failing to diagnose and report Sierra's test results accurately.

This case presents two issues for our review: (1) whether the newborn screening program contained in the Hereditary Disorders Act (Health & Saf. Code, former § 150 et seq., repealed 1995 [now § 124975 et seq., originally enacted as § 150 et seq. by Stats. 1977, ch. 1037, § 1, p. 3131]) imposed a mandatory duty on the Department to select accurate standards for testing for and reporting possible congenital hypothyroidism, breach of which duty could form the basis for a private cause of action against the state by plaintiffs; and (2) assuming an enforceable mandatory duty existed, whether the state was nonetheless immune from suit under the California Tort Claims Act (see Gov. Code §§ 818.2, 818.4, 820.2, 855.6). As will appear, we conclude (contrary to the opinion of the Court of Appeal in this case) that the state owed plaintiffs no mandatory duty with respect to its development of appropriate testing and reporting procedures, and that, in any event, the state was immune from plaintiffs' suit.

## FACTS

The following statement of facts is taken in large part from the Court of Appeal opinion in this case. The first amended complaint contains the following material allegations: Sierra was born on October 20, 1990. Shortly after her birth, and as required by state law, a "test specimen" of her blood was taken and sent to a state-contracted laboratory for analysis to determine the existence of certain genetic disorders, including congenital hypothyroidism. According to plaintiffs, "One purpose of such testing is to determine whether a newborn is producing sufficient thyroid hormone to ensure proper growth and development and to permit early medical intervention if necessary."

Plaintiffs further alleged that "Participation . . . in the newborn screening and/or testing procedures was mandated under state law," and the test "was conducted solely by Defendant STATE and by STATE contracted or approved entities [¶] . . . to ensure full public protection against the devastating effects of preventable hereditary disorders and to permit early detection and necessary medical intervention." According to plaintiffs, "Defendant State was under a mandatory duty to exercise reasonable diligence in the formulation of testing and reporting procedures such that accurate information was made available to parents and physicians of newborns . . . in order to achieve the stated purposes" of state law.

Plaintiffs also alleged the testing laboratory, acting under state contract, informed plaintiffs and their physician the test was "negative" for congenital hypothyroidism. Several months later, plaintiffs discovered Sierra did not have a thyroid gland and suffered from congenital hypothyroidism. Plaintiffs alleged defendant breached its duty by failing to exercise reasonable care and diligence "in the formulation of testing and reporting procedures," resulting in the failure to detect plaintiff Sierra's congenital hypothyroidism. Although not specifically alleged, plaintiffs' implicit premise is that if Sierra's condition had been timely diagnosed, thyroid hormone could have been administered to prevent her injuries.

In addition to the allegations of the first amended complaint, plaintiffs' original complaint had alleged that on October 20, 1990, Sierra was tested for congenital hypothyroidism, that the test findings showed low counts on both the thyroid stimulating hormone (TSH) component and the thyroxin 4 (T4) component of the test, and that defendant had previously determined that only those tests that resulted in a *high* TSH factor and a low T4 factor would be reported as "positive" to the child's parents and pediatrician. According to plaintiffs, defendant knew or should have known that children with a low count on both components of the test "are known to have congenital hypothyroidism . . . ." Plaintiffs charged that defendant "so designed, created, managed, maintained, and operated said testing procedure . . . so as to proximately cause Plaintiff, SIERRA CREASON's, congenital hypothyroidism to go undetected until approximately April 23, 1991 . . . ."

As previously stated, those allegations were contained in plaintiffs' original complaint but were not included in the first amended complaint. Nonetheless, this factual recital may be considered on demurrer despite plaintiffs' subsequent deletion of it. (See 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 419, pp. 514-515, and cases cited.) Indeed, in their opposition to defendant's demurrer to the first amended complaint, plaintiffs reaffirm that

their action is based on the state's incorrect and inaccurate "determination that only those tests that resulted in a <u>high</u> TSH factor, and a low T4 factor would be reported as '<u>Positive</u>' for hypothyroidism."

Based on those allegations in plaintiffs' pleadings, we may assume the gist of their action accuses defendant of adopting faulty testing standards that fail to report all possible cases of hypothyroidism. In other words, any negligence on defendant's part occurred not while testing Sierra but earlier, during the formulation of the standards designed for interpreting and reporting the results of the tests ultimately given. The question before us is whether the state had a mandatory duty to require its testing facilities to report the low TSH test values to parents and treating pediatricians as potentially indicative of hypothyroidism, rather than adopting testing standards deeming those values within a "Normal" or "Negative" range.

Plaintiffs also argue that the trial court abused its discretion in sustaining defendant's demurrer without leave to amend. They assert that, after they filed the first amended complaint, but before the court ruled on the demurrer, they learned additional supporting facts during a 1992 deposition of George Cunningham, M.D., a physician employed by the Department. During his deposition, Dr. Cunningham admitted that the "Negative" test report for plaintiff Sierra inaccurately purported to cover potential "congenital hypothyroidism," rather than "primary" congenital hypothyroidism, a more limited form of the disease that involves the thyroid gland, and the only disease covered by the test. In plaintiffs' view, because hypothyroidism can also exist in secondary and tertiary forms (involving either the pituitary or hypothalamus glands), defendant overstated the scope of the test, thereby possibly misleading Sierra's treating physician into assuming the test was negative as to all three forms of the disease.

Dr. Cunningham, however, also explained at his deposition that the Department previously had formally notified all California doctors treating newborn infants regarding the more restrictive scope of the test, and that these doctors understand that only primary hypothyroidism is reported. Moreover, plaintiffs have not alleged that Sierra suffered from secondary or tertiary hypothyroidism, and, indeed, their allegation that Sierra was born without a thyroid gland appears to confirm she suffered from *primary* hypothyroidism. Accordingly, based on the pleadings and materials plaintiffs submitted, we may assume that any inaccuracies in characterizing the scope of Sierra's test could not have contributed to her injuries.

In any event, even assuming plaintiffs can plead and prove that defendant's choice of language in reporting Sierra's test was inaccurate or misleading, resulting in injury to her, plaintiffs could not prevail under the tort

principles discussed below. The formulation of appropriate language for reporting the scope of medical testing is a discretionary function that could not properly form the basis for public liability based on breach of a mandatory duty. Accordingly, we reverse the Court of Appeal decision and direct affirmance of the judgment of dismissal without leave to amend.

### COURT OF APPEAL DECISION

The Court of Appeal, relying on Government Code section 815.6, concluded the trial court erred in dismissing the action. That section by its terms imposes liability on a public entity if it breaches a mandatory statutory duty that is intended to protect against the kind of injury the party seeking relief has suffered, and the breach proximately caused that injury. The Court of Appeal observed that defendant has acknowledged the injury Sierra suffered was the type the newborn screening program was intended to prevent. (See Health & Saf. Code, former § 150, subd. (c) [now § 124975, subd. (c)].) Furthermore, the amended complaint alleges defendant's negligence caused plaintiffs' injuries. Thus, the only remaining question is whether the Hereditary Disorders Act created a mandatory duty enforceable by a private cause of action. The Court of Appeal concluded it did, reasoning as follows:

"The department must test each newborn child for certain genetic and congenital disorders unless the infant's parents object to the testing on religious grounds. (Health & Saf. Code, [former § 309, subds. (a), (d), now] § 125000, subds. (a) & (d).) Hypothyroidism is one of the disorders covered by the newborn screening program. (Tit. 17, Cal. Code Regs., § 6501, subd. (a).) The Legislature has further directed the tests 'shall be in accordance with accepted medical practices,' and the 'regulations shall follow the standards and principles specified in [Health and Safety Code] Section 124980 [former § 151]' (Health & Saf. Code, § 125000, subd (a) [former § 309, subd. (a)].) Section 124980 [former § 151] requires, 'Clinical testing procedures . . . be accurate, provide maximum information, and . . . produce results that are subject to minimum misinterpretation.' (Health & Saf. Code, § 124980, subd. (d) [former § 151, subd. (d)].)

"The department is required, not requested, to conduct screening tests that are accurate and conducted in a medically approved manner. In addition, its reporting of the test results is required, not requested, to provide maximum information with a minimum of misinterpretation. Thus, the statutory language reflects the Legislature intended these requirements to be obligatory rather than permissive. (*Morris* v. *County of Marin* [(1977)] 18 Cal.3d [901,] 910 [136 Cal.Rptr. 251, 559 P.2d 606].)"

The Court of Appeal, having concluded plaintiffs' complaint adequately alleged defendant's breach of a mandatory duty, turned to the question of

state immunity. As previously noted, the trial court had ruled that, even if a mandatory duty existed, defendant was immune from suit under Government Code section 855.6, which, "Except for an examination or diagnosis for the purpose of treatment," immunizes the state from liability for the failure to make an adequate physical or mental examination to diagnose diseases or other hazardous mental or physical conditions. The Court of Appeal concluded the provision does not afford defendant immunity with respect to the reporting of test results under the newborn screening program, because the diagnosis for hypothyroidism is specifically made for the purpose of early detection and medical intervention and treatment. Former Health and Safety Code section 309, subdivision (a) (now section 125000, subdivision (a)), declares, "It is the policy of the State of California to make every effort to detect, as early as possible, phenylketonuria and other preventable heritable or congenital disorders leading to mental retardation or physical defects." In former Health and Safety Code section 150 (now § 124975), the Legislature found, "Detection through screening of hereditary disorders can lead to the alleviation of the disability of some hereditary disorders and contribute to the further understanding and accumulation of medical knowledge about hereditary disorders which may lead to their eventual alleviation or cure," and that "some . . . disorders may be wholly or partially alleviated through medical intervention and treatment." (Former Health & Saf. Code, § 150, subds. (c), (d) [now § 124975, subds. (c), (d)].) Based on these provisions, the Court of Appeal concluded, "the newborn screening program is for the purpose of treatment and falls outside Government Code section 855.6. (See *Smith* v. *County of Kern* (1993) 20 Cal.App.4th 1826, 1830, 1835 [25 Cal.Rptr.2d 716].)"

## DISCUSSION

### A. *Liability Based on Mandatory Duty*

■ Analytically, although the issues are somewhat related, the question of possible statutory liability for breach of a mandatory duty ordinarily should precede the question of statutory immunity. (See, e.g., *Caldwell* v. *Montoya* (1995) 10 Cal.4th 972, 978, fn. 3 [42 Cal.Rptr.2d 842, 897 P.2d 1320]; *Nunn* v. *State of California* (1984) 35 Cal.3d 616, 622, fn. 4 [200 Cal.Rptr. 440, 677 P.2d 846].) Accordingly, we first examine the liability issue.

■ The California Tort Claims Act provides that a public entity is not liable for injury arising from an act or omission except as provided by statute. (Gov. Code, § 815, subd. (a); see *Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 809 [205 Cal.Rptr. 842, 685 P.2d

1193].) Under Government Code section 815.6, as we have construed it, "a public entity is liable for an injury proximately caused by its failure to discharge a mandatory duty designed to protect against the risk of a particular kind of injury . . . ." (*Morris* v. *County of Marin* (1977) 18 Cal.3d 901, 904 [136 Cal.Rptr. 251, 559 P.2d 606] (*Morris*); see *Washington* v. *County of Contra Costa* (1995) 38 Cal.App.4th 890, 896 [45 Cal.Rptr.2d 646]; *State of California* v. *Superior Court* (1984) 150 Cal.App.3d 848, 854 [197 Cal.Rptr. 914].) Whether a particular statute is intended to impose a mandatory duty, rather than a mere obligation to perform a discretionary function, is a question of statutory interpretation for the courts. (*Nunn* v. *State of California, supra,* 35 Cal.3d at p. 624.)

In plaintiffs' view, the state breached a mandatory duty to devise accurate testing and reporting standards for hypothyroidism. Defendant asserts in response that, under the Hereditary Disorders Act, the formulation of appropriate standards for testing and reporting test results for hypothyroidism is a *discretionary* function that could not properly form the basis for public liability based on breach of a mandatory duty. (See *Morris, supra,* 18 Cal.3d at pp. 910-911, fn. 6 (maj. opn. of Tobriner, J.); *id.* at p. 924 (conc. opn. of Clark, J.); *Searcy* v. *Hemet Unified School Dist.* (1986) 177 Cal.App.3d 792, 802 [223 Cal.Rptr. 206]; cf. Gov. Code, § 820.2 [statutory immunity for discretionary acts and omissions].)

Although the Court of Appeal decision stressed the mandatory language of the statutes at issue here, we were careful to explain in *Morris* that "there are unquestionably instances in which other factors will indicate that apparent obligatory language was not intended to foreclose a governmental entity's or officer's exercise of discretion. [Citations.]" (*Morris, supra,* 18 Cal.3d at p. 911, fn. 6; see also *Zolin* v. *Superior Court* (1993) 19 Cal.App.4th 1157, 1166 [23 Cal.Rptr.2d 871]; *State of California* v. *Superior Court* (1992) 8 Cal.App.4th 954, 958 [10 Cal.Rptr.2d 527] (*Ushana D.*); *MacDonald* v. *State of California* (1991) 230 Cal.App.3d 319, 331 [281 Cal.Rptr. 317] (*MacDonald*); *Tirpack* v. *Los Angeles Unified School Dist.* (1986) 187 Cal.App.3d 639, 642-647 [232 Cal.Rptr. 61] (*Tirpack*).)

■ As will appear, the statutory scheme at issue here makes reasonably clear that the state is given substantial *discretion* in formulating and reporting appropriate testing standards for hypothyroidism, although the Legislature has specified certain general principles to guide the exercise of that discretion. Moreover, although the Hereditary Disorders Act included some mandatory language in describing the state's obligations, the act's provisions disclose no legislative intent to confer a private right of action for the state's breach of its statutory duties.

Several factors support the view that the Legislature did not intend to permit a private action for damages against the state for its negligence in formulating standards for testing or reporting potential hereditary disorders. First, the Legislature included language in the Hereditary Disorders Act strongly suggesting that the state's formulation of those standards is a discretionary, not a mandatory, function. In Health and Safety Code former section 150 (now § 124975), the Legislature set forth a variety of findings and declarations acknowledging the importance of screening for hereditary disorders and the entitlement of all persons to adequate health services. (See Health & Saf. Code, former § 150, subds. (a), (c) [now § 124975, subds. (a), (c)].) The section also observed, however, that specific legislation aimed at alleviating the problems associated with these disorders "may tend to be inflexible in the face of rapidly expanding medical knowledge, underscoring the need for *flexible approaches* to coping with genetic problems" (Health & Saf. Code, former § 150, subd. (g) [now § 124975, subd. (g)], italics added), and provided that state policy in this area should be "constantly reviewed to consider changing medical knowledge and ensure full public protection" (Health & Saf. Code, former § 150, subd. (h) [now § 124975, subd. (h)]).

Following up on this theme of caution, flexibility, and constant review of changing medical knowledge, the Legislature vested the Director of Health Services (Director) with the duty to "establish such rules, regulations, *and standards* for hereditary disorders programs *as the director deems necessary* to promote and protect the public health and safety, in accordance with the principles established herein." (Health & Saf. Code, former § 151 [now § 124980], italics added.) This language points forcefully toward the conclusion that the Legislature left the selection of necessary and appropriate testing and reporting standards to the sound discretion of the Director, guided by certain "principles" that the Director should consider in drafting those standards.

One of these statutory principles, on which plaintiffs rely, is that "Clinical testing procedures . . . be accurate, provide maximum information, and that the testing procedures selected produce results that are subject to minimum misinterpretation." (Health & Saf. Code, former § 151, subd. (d) [see new § 124980, subd. (d)].) Contrary to plaintiffs' argument, we think this provision creates no affirmative mandatory duty of care to other persons, but instead represents only a general principle or policy to guide the state's discretion in formulating appropriate testing and reporting standards. Similarly, a separate section sets forth the state policy of making "every effort to detect, as early as possible" preventable heritable or congenital disorders. This section charges the state with promoting a statewide testing program "in accordance with accepted medical practices." Tests under the program

"shall be administered to each child . . . *at such time as the state department has established appropriate regulations and testing methods.*" (Health & Saf. Code, former § 309, subd. (a) [now § 125000, subd. (a)], italics added.) Once again, mandatory statutory language is tempered by reference to the state's discretion in formulating "appropriate" testing standards. Neither of the provisions on which plaintiffs rely imposes a duty to notify parents or physicians of test results showing particular TSH levels.

Read together, all these provisions indicate the Legislature intended that the Department, after considering the ever-increasing and changing information concerning heritable and congenital defects, as well as expert and public views on testing, would exercise discretion in selecting necessary and appropriate testing and reporting standards. We find it highly unlikely the Legislature intended that an asserted breach of the guiding principles or policies would afford a basis for state liability under Government Code section 815.6. The drafting of rules, regulations and standards by the governmental agency charged with that responsibility would unquestionably fall in the category of discretionary "basic policy decisions" for which governmental agencies usually are insulated from civil liability. (See *Johnson* v. *State of California* (1968) 69 Cal.2d 782, 793-794 [73 Cal.Rptr. 240, 447 P.2d 352] (*Johnson*), italics omitted.)

Although, as we have observed, the question of state *immunity* from suit is a separate issue, discussed below, cases such as *Johnson*, involving claimed immunity for "discretionary" acts (see Gov. Code, § 820.2), obviously are instructive in determining whether "mandatory acts" liability should be imposed. As we stated in *Johnson*, this immunity is usually extended to the "planning" rather than the "operational" levels of decisionmaking, i.e., "those areas of quasi-legislative policy-making which are sufficiently sensitive to justify a blanket rule that courts will not entertain a tort action alleging that careless conduct contributed to the governmental decision." (*Johnson, supra,* 69 Cal.2d at p. 794, fn. omitted; see also *Caldwell* v. *Montoya, supra,* 10 Cal.4th at pp. 979-984; *Nunn* v. *State of California, supra,* 35 Cal.3d at p. 622 [promulgation by state agency of regulations governing firearm use by licensed private patrol agency employees necessarily involves discretionary "planning" decisions rather than nondiscretionary "operational" or "street level" ones]; *Kemmerer* v. *County of Fresno* (1988) 200 Cal.App.3d 1426, 1437-1438 [246 Cal.Rptr. 609]; *Burgdorf* v. *Funder* (1966) 246 Cal.App.2d 443, 449 [54 Cal.Rptr. 805] [generally, discretionary act involves exercise of judgment or choice].)

We think that a state officer or agency entrusted with the important task of drafting appropriate health and safety rules or standards certainly is engaged

in "quasi-legislative policy-making" involving the exercise of "judgment or choice" as to "basic policy decisions," for which tort immunity is usually deemed justified under the authorities cited. (Cf. Cal. Government Tort Liability Practice 3d (Cont.Ed.Bar 1992) General Liability and Immunity Principles, § 2.119, p. 225 ["Discretionary immunity obtains if the action challenges the authorized prescription by legislative or executive-level management of institutional rules or decisions calculated to affect persons generally, rather than ad hoc decisions intended to apply such general rules or policies to specific individuals or factual events."].)

We note that the statutory "guiding principles" on which plaintiffs base their cause of action are themselves quite general and broad and are subject to considerable interpretation. Rather than requiring the state specifically to notify parents or physicians of test results showing low TSH component factors, these statutes simply call for development of testing programs that produce "accurate" results and "maximum information" in accordance with "accepted" medical practices. (Health & Saf. Code, former §§ 151, subd. (d), 309, subd. (a) [now §§ 124980, subd. (d), 125000, subd. (a)].) We doubt the Legislature intended through this general language to open the courts to wide-ranging claims attacking the accuracy or medical acceptance of state-developed testing and reporting standards. None of the legislative history materials the parties submitted discloses any such intent.

Defendant had cited to the Court of Appeal several appellate decisions holding that, in the absence of a contrary legislative intent, a governmental entity's breach of a statutory duty phrased in mandatory terms nonetheless did not give rise to a private cause of action. (*Ushana D., supra,* 8 Cal.App.4th at p. 958; *MacDonald, supra,* 230 Cal.App.3d at p. 331; *Tirpack, supra,* 187 Cal.App.3d at pp. 642-647.) The Court of Appeal found these cases distinguishable because each involved statutory mandates created for the protection of the general public. In the present case, according to the Court of Appeal, the Legislature had a narrower focus in establishing the newborn screening program, namely, to advise and assist parents of infants born with heritable or congenital disorders that require early intervention. The fact remains, however, that the program at issue here is also explicitly aimed at relieving the general public of the economic and social burdens of hereditary disorders and promoting medical understanding of those disorders. (See Health & Saf. Code, former § 150, subds. (b), (c); [now § 124975, subds. (b), (c)].)

Moreover, we question the Court of Appeal's characterization of *Ushana D., MacDonald,* and *Tirpack* as involving only laws directed toward protecting the general public. A close reading of the statutes at issue in those cases

indicates they were narrowly aimed at protecting children from, respectively, molestation (*Ushana D., supra,* 8 Cal.App.4th at p. 956), injury by licensed daycare facility operators (*MacDonald, supra,* 230 Cal.App.3d at p. 331), and unjustified suspension from school (*Tirpack, supra,* 187 Cal.App.3d at pp. 641-642). *MacDonald* is particularly apposite because it involved the state's failure to perform a mandated on-site visitation of any daycare facility that had been the subject of citizen complaints. The court found that the statute at issue merely expressed "a general declaration of policy goals" (*MacDonald, supra,* 230 Cal.App.3d at p. 330), and did not create a private cause of action on behalf of children injured by daycare personnel (*id.* at p. 322; see also *Gray* v. *State of California* (1989) 207 Cal.App.3d 151, 155-157 [254 Cal.Rptr. 581]).

We conclude that the general statutory principles and policy goals plaintiffs cite in the present case likewise fail to comprise a mandatory duty to select or impose any particular testing or reporting standard or component, and that the Director's allegedly negligent exercise of discretion in selecting a particular standard will not support a cause of action under Government Code section 815.6. The Hereditary Disorders Act's creation of a limited right of action for any individual "whose confidentiality has been breached" by a violation of the act, in the same section that imposed a duty on the Director to establish a testing program, supports this conclusion. (Health & Saf. Code, former § 151, subd. (k) [now § 124980, subd. (k)].) The Legislature's failure to specify any other private cause of action arising under the act may indicate that none was intended. (See, e.g., *Faria* v. *San Jacinto Unified School Dist.* (1996) 50 Cal.App.4th 1939, 1945 [59 Cal.Rptr.2d 72].)

B. *Immunity From Liability*

█ Even had plaintiffs' complaint stated a cause of action against defendant for breach of a mandatory statutory duty to formulate accurate testing and reporting standards for hypothyroidism, plaintiffs could not prevail if defendant was immune from suit. If a specific immunity statute applies, it "cannot be abrogated by a statute which simply imposes a general legal duty or liability . . . ." (*Caldwell* v. *Montoya, supra,* 10 Cal.4th at p. 986.) Defendant contends that Government Code section 855.6 provides specific immunity in this case. We agree. Our analysis makes it unnecessary to consider defendant's alternate theories of immunity under Government Code sections 820.2 (general discretionary act immunity), 818.2 (immunity for adopting or failing to adopt "enactment" or "law"), or 818.4 (immunity for issuing or failing to issue "permit, license, . . . or similar authorization").

Government Code section 855.6 provides: "*Except for an examination or diagnosis for the purpose of treatment,* neither a public entity nor a public

employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or *to make an adequate physical or mental examination*, of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others." (Italics added.)

Defendant contends the Court of Appeal erred in concluding that the development of testing or reporting standards for mass neonatal screening is "an examination or diagnosis for the purpose of treatment" within the meaning of Government Code section 855.6, and therefore constitutes an exception to the general rule of immunity for making an inadequate physical or mental examination. In plaintiffs' view, developing standards for testing and reporting possible hypothyroidism indeed involved "an examination or diagnosis for the purpose of treatment" because the state's testing and reporting standards were developed for *ultimate* use in examining and diagnosing children for the purpose of treating them for hereditary disorders.

Defendant, on the other hand, points to language in the California Law Revision Commission Comment to Government Code section 855.6 indicating that the "purpose of treatment" exception was intended to be narrowly applied to cases involving negligent treatment of particular individuals in doctors' offices or hospitals, rather than to the initial development of testing and reporting standards governing laboratory tests given to help detect congenital diseases.

According to this comment, Government Code section 855.6 "grants an immunity for failure to perform adequately *public health examinations*, such as public tuberculosis examinations, physical examinations to determine the qualifications of boxers and other athletes, and eye examinations for vehicle operator applicants. It does not apply to examinations for the purpose of treatment such as are made *in doctors' offices and public hospitals*. In those situations, the ordinary rules of liability would apply. [¶] The immunity provided by this section relates only to failure to make any examination or, if an examination is made, to the 'adequacy' of the examination; the section does not provide immunity, for example, where a public employee negligently injures a person while making an examination." (Cal. Law Revision Com. com., 32 West's Annot. Gov. Code (1995 ed.) foll. § 855.6, p. 487, italics added; see also Cal. Government Tort Liability Practice 3d, *supra*, Liabilities and Immunities, § 4.83, at pp. 547, 548 [§ 855.6 "is not a blanket immunity from medical malpractice liability"]; *Colome* v. *State Athletic Com.* (1996) 47 Cal.App.4th 1444, 1458-1459 [55 Cal.Rptr.2d 300] [upholding immunity claim because purpose of physical examination of professional

boxer was to determine fitness for license, not treatment]; *Smith* v. *County of Kern* (1993) 20 Cal.App.4th 1826, 1833-1835 [25 Cal.Rptr.2d 716] (*Smith*) [denying immunity claim because purpose of blood test of third person was to diagnose and treat plaintiffs' exposure to acquired immunodeficiency syndrome (AIDS)].)

The preceding explanatory comment was itself based on a 1963 Law Revision Commission report that further explained the policy reasons underlying the immunity in favor of public entities charged with giving physical or mental examinations: "To provide the utmost public protection, public entities should not be dissuaded from engaging in such activities by the fear that liability may be imposed if an employee performs his duties inadequately. Far more persons would suffer if government did not perform these functions at all than would be benefited by permitting recovery in those cases where the government is shown to have performed inadequately." (Recommendation Relating to Sovereign Immunity, No. 1, Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) p. 831.)

Plaintiffs rely heavily on *Smith, supra,* 20 Cal.App.4th 1826, but that case is readily distinguishable. In *Smith*, plaintiff, a police officer, had come into contact with blood from a third person possibly suffering from AIDS, and plaintiff feared exposure to the disease. County employees then negligently tested the person for hepatitis rather than AIDS, resulting in six months' delay, and plaintiff's consequent mental anguish, before another test could be made. Unlike the present case, the negligent test occurred in a public medical facility, and was conducted for the purpose of treating the plaintiff for infection with the AIDS virus. The test therefore clearly fell within the "purpose of treatment" exception to immunity under Government Code section 855.6. As previously stated (*ante*, at p. 628), in the present case, any negligence on defendant's part occurred not while testing Sierra but earlier, during the formulation of the standards designed for interpreting and reporting the results of the tests ultimately given. The formulation of test standards could not reasonably be deemed "an examination or diagnosis" within the meaning of Government Code section 855.6.

Based on the available legislative history and case law, defendant argues that Government Code section 855.6 was intended to immunize public entities from liability in connection with development of testing and reporting standards for mass public screening efforts such as the "public tuberculosis examinations" referred to in the noted Law Revision Commission Comment or the neonatal screening program involved here, programs that do not focus on the "in hospital" diagnosis and treatment of a specific patient.

Although the Hereditary Disorders Act expressly requires that testing and counseling services be made available, the act does not include provisions calling for treatment of any genetic diseases detected by newborn screening. (See Health & Saf. Code, former § 151, subds. (g), (h) [now § 124980, subds. (g), (h)]; former § 309, subds. (e), (f) [now § 125000, subds. (e)(1), (g)].)

The Court of Appeal's contrary holding could deprive all medical screening programs from testing immunity, as all these programs are *ultimately* aimed at treating persons diagnosed as suffering from various ailments or conditions. As the 1963 Law Revision Commission Report suggests, such a broad holding could discourage further testing, to the ultimate detriment of all these salutary programs.

## CONCLUSION

For these reasons, we conclude the trial court properly sustained defendant's demurrer to the first amended complaint without leave to amend. Accordingly, the judgment of the Court of Appeal is reversed with directions to affirm the trial court order dismissing, without leave to amend, plaintiffs' action as against defendant State Department of Health Services.

George, C. J., Mosk, J., Baxter, J., Werdegar, J., and Brown, J., concurred.

**KENNARD, J.,** Concurring.—This is indeed a tragic case. A diagnostic blood test performed under a state-mandated program[1] that screens California-born babies for certain inherited disorders showed that plaintiff Sierra Creason had tested "negative" for congenital hypothyroidism. A few months later, however, the family doctor determined that Sierra had no thyroid gland and that her condition had progressed to irreversible mental retardation. Although the state-mandated test here was properly performed under the testing procedure established by the State Department of Health Services (Department), plaintiffs allege that the Department negligently determined not to report certain test results as indicating possible hypothyroidism.

The majority holds, and I agree, that the Department is not liable for injuries resulting from congenital disorders that its testing program failed to detect in a particular case. In establishing the neonatal program at issue, the Legislature sought to reduce the "often costly, tragic, and sometimes deadly burdens to the health and well-being of the citizens of this state" (Health & Saf. Code, § 124975, subd. (b)) caused by hereditary disorders and to "contribute to the further understanding and accumulation of medical knowledge [about such disorders] that may lead to their eventual alleviation or

---

[1] The Hereditary Disorders Act appears in Health and Safety Code section 124975 et seq.

cure" (*id.*, subd. (c)). Neonatal screening leads to preventive treatment of those children found to have hereditary disorders. In Sierra's case, tragically, the Department's test report failed to alert her parents and family doctor that Sierra suffered from hypothyroidism.

But to impose civil liability on the Department here and in any similar future case may well threaten the continuation of a generally beneficial statewide program that has screened millions of California babies for disabling congenital disorders. In a recent newsletter, the Department pointed out that between 1980 and 1995 approximately 99 percent of babies born in California were tested and that the screening of 7,443,147 infants detected 2,271 cases of congenital hypothyroidism. (Newborn Screening News, *California's Newborn Screening Program* (Cal. Dept. Health Services, Summer 1996) p. 6.) As the Law Revision Commission stressed in 1963, when it urged the Legislature to insulate government agencies from liability for mass public health screening programs, "Far more persons would suffer if government did not perform these functions at all than would be benefited by permitting recovery in those cases where the government is shown to have performed inadequately." (Recommendation Relating to Sovereign Immunity, No. 1, Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law. Revision Com. Rep. (1963) p. 831.)

The facts of this case are heartrending, and the desire to afford the stricken child and her parents some measure of comfort and financial assistance is strong. But these considerations alone cannot dictate the outcome in this case. The Legislature's decision to provide a generally beneficial neonatal medical screening program without state liability is one we must respect. Nor is it a heartless decision, for if the alternative is not a program with liability but no program at all, more rather than fewer of these tragedies would result.